IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DANIEL ROOT, | CV 18-164-BLG-SPW-TJC |
| Plaintiff, | |
| | **FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |
| vs. | |
| MONTANA DEPARTMENT OF CORRECTIONS dba MONTANA WOMEN'S PRISON, PAUL LAW and ALEX SCHROECKENSTEIN, | |
| Defendants. | |

Plaintiff Daniel Root ("Root") brings this action against Defendants Montana Department of Corrections (the "DOC") and Alex Schroeckenstein for retaliation relating to his employment as a correctional officer at the Montana Women's Prison.[1]  (Doc. 1.)

Presently before the Court are the DOC's Motion for Partial Summary Judgment (Doc. 29) and Defendants' Motion for Summary Judgment (Doc. 46), which have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B).  The motions are fully briefed and ripe for the Court's review.

---

[1] Root also brought claims against Defendant Paul Law, which were subsequently dismissed by the Court.  (*See* Doc. 14.)

Having considered the parties' submissions, the Court **RECOMMENDS** the DOC's Motion for Partial Summary Judgment be **GRANTED in part and DENIED in part**, and Defendants' Motion for Summary Judgment be **GRANTED in part and DENIED in part**.

## I.     FACTUAL BACKGROUND[2]

Root is an employee of the DOC, and works as a correctional officer at the Montana Women's Prison ("MWP").  Root alleges that in May 2017, he reported that his supervisor, Lt. Paul Law, had engaged in inappropriate sexual conduct with or towards a female prisoner in violation of the Prison Rape Elimination Act ("PREA").

After he did so, Law conducted a staff briefing on May 24, 2017, where Root alleges he was angry and agitated.  Law reportedly acted out during the briefing and expressed disdain for any officer who makes complaints against him, accused them of being vindictive, derided their commitment to the job, and recommended any such officer stop coming to work and take time off.  Root contends Law's purpose in acting out at the briefing was to deter subordinate officers from making complaints about Law's conduct.

---

[2] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions and are undisputed except where indicated.

Based on Law's conduct at the briefing, Root presented a grievance under his union contract on May 26, 2017.  Root alleges that on June 8, 2017, DOC human resources personnel requested that he suspend his grievance pending an investigation of Law's conduct.  Root maintains he was promised that he could re-file the grievance if he deemed it appropriate following the DOC investigation.  The next day, Root agreed to suspend his grievance as requested.

On July 14, 2017, however, Root's grievance was denied.  Root asserts that, contrary to the DOC's representation that the grievance would be suspended, it was denied without providing him the opportunity to re-file and without any effective investigation.

Beginning in July 2017, Root was assigned to act as "Officer in Charge" of the night shift.  He performed the duties of the Officer in Charge on a majority of his working days from July 2017 through December 2017, with no associated increase in rank or pay.

In November 2017, Root applied for an open lieutenant position at the MWP.  Associate Warden Alex Schroeckenstein was on the interview panel, and Root claims he was informed by another MWP employee, Lt. Moorman, that Schroeckenstein was still "pissed off" at Root for reporting Law's sexual misconduct and he told Root that Schroeckenstein had animosity toward him.

3

Root was not selected for the position.  Root contends another officer was promoted who had less experience and qualifications for the job, and who had been subject to prior disciplinary actions.  Root asserts he has never been subject to any disciplinary action by the DOC.  He also states that shortly after his application was rejected, he was recognized as "Employee of the Quarter" for his job performance, including his work as Officer in Charge of his shift.

On February 23, 2018, Root filed a complaint with the Montana Human Rights Bureau ("HRB") and Equal Employment Opportunity Commission ("EEOC").  He alleged he was not selected for the lieutenant position because he was being retaliated against for filing PREA complaints.  Root filed an amended complaint on February 27, 2018, to include the Law briefing in May 2017 and the suspension of his grievance in June 2017.  The HRB investigated Root's complaint and concluded there was no cause to find retaliation had occurred.

In May 2018, Root was subpoenaed to testify in a court proceeding concerning Law and his workplace conduct.  Root asserts he was interviewed by the attorney who served the subpoena, and he later appeared in court to testify on May 16, 2018, but the matter was continued.  On June 6, 2018, Root reported to the courthouse again and spent approximately 3 hours testifying and/or waiting to testify.

Root alleges that he requested to be paid his usual compensation for the time he spent responding to the subpoena. Root states the DOC initially declined his request as not work related, but ultimately paid him for three hours, reflecting the time he spent testifying and waiting to testify, but not for the time he spent being interviewed by the attorney. Root did not file a grievance regarding the payment. Root claims he made no further effort to recoup his lost wages out of concern of retaliation.

During his interview with the attorneys involved in his court appearance, Root claims that he learned further information indicating that Law had engaged in, or might engage in, sexual misconduct toward female prisoners. On May 18, 2018, Root asked Jessica Sosa, the PREA Compliance Manager for MWP, whether there were any options for reporting PREA violations to persons outside of the DOC. On May 22, 2018, Sosa informed him that he could make a report to the YMCA. Although Sosa indicated Root could contact the YMCA, the contact information she gave him was for the YWCA-Billings. Root alleges the number was for the YWCA sexual assault and domestic violence crisis helpline. Root states he subsequently learned that the YWCA-Billings was not a proper third-party reporting agency. Root further alleges the DOC refused to respond to his follow-up requests about the specific procedures he should use to make a third-party report.

5

Instead, Root asserts that on July 13, 2018, the DOC ordered Root to report any PREA information about Law directly to the DOC.  He claims he was threatened with adverse action for "further violation" of DOC policy if he did not report as ordered.  Therefore, Root reported the PREA information on July 13, 2018 to DOC human resources and his immediate supervisor, Lieutenant Johnston.

Root alleges that after reporting the PREA information, Johnston acted out against him during their shift, made false and accusatory statements regarding Root's conduct in making the PREA report, and demanded Root meet unrealistic work assignments before the end of his shift.

Root filed a second grievance concerning Johnston's actions on July 20, 2018, and he was re-assigned to a shift not commanded by Johnston.  But on August 14, 2018, Root's grievance was denied, and he was returned to the shift commanded by Johnston.

Root asserts that on September 12, 2018, he met with a member of the media outside of work, who requested information regarding conditions at the prison, particularly instances of sexual misconduct by ranking officers.  Root states he called the DOC to ask for clarification and guidance about whether he could discuss such matters with the media.  Root alleges DOC personnel declined to provide any guidance, and this dissuaded him from speaking freely with the media and left him in fear of retaliation.

6

On November 18, 2018, Root filed this lawsuit, alleging retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count I); the Montana Human Rights Act ("MHRA"), Mont. Code Ann. Title 49 (Count II); and 42 U.S.C. § 1983 for violation of his First Amendment rights (Count III).

On January 22, 2019, Root filed a second complaint with the HRB.  Root alleged he was retaliated against in three other instances: in May 2018, when Sosa misidentified the YMCA as the third-party reporting agency; in June 2017, when he was only paid for three hours of witness testimony and not the additional time he spent preparing to testify; and in September 2018, when he sought clarification regarding speaking with the media.

The HRB investigated the complaint and concluded no retaliation had occurred.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any

material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

## III.   THE DOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.   Count I – Title VII Claim: Whether Root Engaged in a Protected Activity

In Count I of his complaint, Root claims he was retaliated against for engaging in activities protected under Title VII.  The anti-retaliation provision of Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a).

To establish a prima facie case of retaliation under this section of Title VII, the plaintiff must show (1) he engaged in a protected activity, (2) he was subsequently subjected to an adverse employment action, and (3) there was a causal link between his activity and the employment decision.  *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984).

The DOC contends Root cannot satisfy the first requirement because violations of PREA are not unlawful employment practices under Title VII.  The DOC therefore argues that Root's claim in Count I fails as a matter of law because reporting an alleged PREA violation is not a protected act under Title VII.  Root counters that his reporting was a protected activity because both he and the DOC believed the activity to be protected.

To satisfy the first requirement, the opposed conduct "must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).  Nevertheless, the plaintiff need not prove that the conduct he opposed was in fact unlawful under Title VII. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).  Rather, "opposition clause protection will be accorded 'whenever the opposition is based on a '*reasonable belief*' that the employer has engaged in an unlawful employment practice." *Id.* (emphasis in original) (citing *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983).  Even an erroneous belief that an employer engaged in an unlawful employment practice may be actionable under Title VII, if it is premised on a reasonable mistake made in good faith.  *Id.  See also Sias v. City Demonstration Agency*, 588 F.2d 692, 685 (9th Cir. 1978) ("When an employee reasonably believes that discrimination exists, opposition thereto is opposition to an employment practice made unlawful by Title VII even if the employee turns out

9

to be mistaken as to the facts."); *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) ("[A] plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII.  To establish the first element of a prima facie case, [the plaintiff] must only show that she had a 'reasonable belief' that the employment practice she protested was prohibited under Title VII."); *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987) ("[T]he employee need only reasonably believe that the employer has engaged in an unlawful employment practice.").

The reasonableness of the plaintiff's belief that an unlawful employment practice occurred is measured by an objective standard.  *Moyo*, 40 F.3d at 985. This standard must make due allowance "for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims."  *Id.* Additionally, the Ninth Circuit has directed that Title VII be construed broadly, and that directive is to be taken into account when determining the reasonableness of the plaintiff's belief.  *Reece v. Pocatello/Chubbuck School Dist. No. 25*, 713 F.Supp.3d 1222, 1233 (2010).

The Court finds there is evidence in the record from which a trier of fact could find Root reasonably believed Law's actions violated Title VII,[3] and as such,

---

[3] Root alternatively argues Court should adopt the "perception theory" for Title VII cases.  Under the perception theory, a retaliation claim may be brought where the

his reporting of the alleged PREA violation was a protected activity.

First, the DOC itself determined that Root had engaged in protected activity. On May 2017, Root submitted a union grievance regarding Law's behavior following Root's PREA report.  (Doc. 33-4.)  On July 14, 2017, Root received a letter from DOC Human Resources Manager, Cynthia Davenport, informing him that his grievance had been denied.  (Doc. 33-6.)  In the letter, Davenport set forth the correct standard for showing a case of retaliation, including that the "claimant must demonstrate that they engaged in a protected activity, they were subjected to an adverse employment action, and that the adverse employment action was only because they engaged in the protected activity."  (*Id.* at 1.)  She went on to state that "[y]ou filed a PREA complaint relative to Lt. Law, *by filing this complaint you have demonstrated you engaged in a protected activity*."  (*Id.* (emphasis added).)  Davenport explained, however, that Root's grievance had been denied because the

---

employer retaliates against an employee in the mistaken belief that the employee had engaged in a protected activity.  *See e.g. Heffernan v. City of Paterson*, 136 S.Ct. 1412,1418 (2016) (First Amendment retaliation claim); *Stilwell v. City of Williams*, 831 F.3d 1234 (9th Cir. 2016) (First Amendment retaliation claim); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d Cir. 2002) (retaliation claim brought under the ADA and ADEA).  The Court notes, however, that the Ninth Circuit has not applied the perception theory to Title VII retaliation cases.   In light of the Court's determination that there is evidence from which Root could have reasonably believed his PREA reporting was a protected activity under Title VII, the Court need not reach the issue of whether the perception theory is appropriate in this case.

issues he described "do not fit the definition of 'materially adverse' as noted by the

[EEOC]." (*Id.*)  In conclusion, Davenport stated:

> [R]etaliation for engaging in protected activities cannot and will not
> be tolerated in the Montana Department of Corrections and it is our
> philosophy to actively address claims of this nature.  *I establish you
> engaged in protected activity* and that your May 24, 2017 claim of
> retaliation was investigated and addressed.  I could not substantiate
> that further adverse action has occurred therefore your grievance and
> suggested remedy is denied.

(*Id.* at 2 (emphasis added).)

These statements by a Human Resources manager, presumably trained to

investigate retaliation claims, could reasonably lead a layperson, like Root, to

believe that he had engaged in protected conduct.[4]  Davenport's specific statement,

that Root had engaged in protected conduct by filing a PREA complaint, also

supports a finding that Root reasonably believed his PREA report fell under Title

VII.  Accordingly, a jury could find Root engaged in a protected activity, because

---

[4] Root argues the DOC should be estopped from contending that his PREA
reporting was not a protected activity based on Davenport's statements in the July
14, 2017 letter.  Root, however, has not established the elements of equitable
estoppel under federal law.  "The elements of estoppel are: (1) knowledge of the
true facts by the party to be estopped; (2) intent to induce reliance or actions
giving rise to a belief in that intent; (3) ignorance of the true facts by the relying party;
and (4) detrimental reliance."  *Bolt v. United States*, 944 F.2d 603, 609 (9th Cir.
1991).  Here, Root has not shown the DOC knew the true facts or intended to
induce reliance.  Nevertheless, the Court finds Davenport's letter is probative
evidence that indicates Root reasonably believed he had opposed an unlawful
employment practice under Title VII.

even if mistaken, he held an objectively reasonable belief that his PREA complaint fell under Title VII.

Second, Root asserts that he reasonably believed Law's conduct arose in the employment context because at least one of the female inmates who had been allegedly assaulted by Law was a janitorial employee supervised by Law.  The Ninth Circuit has not foreclosed the possibility that inmates may be considered employees under Title VII in certain circumstances.  *See Baker v. McNeil Island Corrections Ctr.*, 859 F.2d 124, 128 (9th Cir. 1988) (indicating a prisoner could be an employee under Title VII where the inmate's work was undertaken voluntarily, or pursuant to a work release program); *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1331 n. 5 (9th Cir. 1991) (Rymer, concurring in part) (noting "an inmate might be an employee of a prison for purposes of Title VII where the inmate has an option of whether or not to work.").

Here, Root notes that the female inmates worked various jobs in the prison. In order to obtain these positions, the inmates had to submit an application and cover letter, and participate in an interview.  (Doc. 32-1 at ¶¶ 3-4.)  The inmates who work are also paid by the state in the form of deposits to their individual accounts.  (*Id.* at ¶ 4.)  The inmate Law allegedly assaulted was employed as a nighttime janitorial/maintenance worker, and was paid for the work she performed.

(*Id.* at ¶ 6.)  As such, there are facts which could support Root's claim that female inmates were employees under Title VII.

But even if Root was mistaken in his belief that the female inmates were employees under Title VII, "[a] good-faith mistake may be one of fact or of law." *Moyo*, 40 F.3d at 984, 985.  In *Moyo*, for example, a prison guard was fired after protesting that white inmates were allowed to shower following a work shift, while black inmates were not.  As in this case, the defendants argued the plaintiff's Title VII claim should be dismissed because inmates working directly for a prison were not employees protected by Title VII.  The Ninth Circuit found, however, that if the plaintiff could show he reasonably believed an unlawful employment practice occurred, he could state a retaliation claim regardless of whether the inmates actually qualified as employees.  *Moyo*, 40 F.3d at 985.  The court said "[i]f [the plaintiff] reasonably believed that the inmates were protected by Title VII, then his opposition to their treatment would be a statutorily protected activity."  *Id.*

The same is true here.  Given Root's status as a lay employee, his perception that female inmate workers were being sexually harassed or abused could give rise to a reasonable belief that an unlawful employment practice was occurring.  As such, the Court finds the DOC has not shown, as a matter of law, that Root's PREA reporting was not a protected activity under Title VII.

14

Accordingly, the Court finds the DOC's motion for partial summary judgment as to Count I should be DENIED.

**B.     Count II – Exhaustion of MHRA Claims Prior to August 25, 2017 and Between February 27, 2018 and July 26, 2018**

In Count II of his complaint, Root alleges a retaliation claim under the Montana Human Rights Act.  The DOC moves for partial summary judgment on the claim on grounds that Root failed to exhaust his Montana Human Rights Act claims for acts that occurred prior to August 2017 and also for the time period between February 27, 2018 and July 26, 2018.  Root counters that his claims prior to August 2017 may be considered for the purposes of determining the DOC's overall liability.  Root further argues that his claims accruing between February 27, 2018 and July 26, 2018 are like or reasonably related to the incidents he described in his initial HRB complaint, and therefore did not have to be separately exhausted.

**a.     Claims Prior to August 25, 2017**

A plaintiff alleging retaliation in violation of the MHRA must file a complaint with the Montana Human Rights Bureau "within 180 days after the alleged unlawful discriminatory practice occurred or was discovered."  Mont. Code Ann. § 49-2-501(4)(a).  Root filed his first complaint of retaliation with the HRB

on February 23, 2018.[5]  (Doc. 33-14.)  Accordingly, any alleged instances of retaliation occurring prior to August 25, 2017 are untimely.

Root alleged he was retaliated against by Law on May 24, 2017 during a shift briefing.  Therefore, to fall within the 180-day filing period any complaint regarding the alleged retaliation had to be filed by November 20, 2017.  Root's HRB complaint was not filed until approximately three months after that deadline. Therefore, Root did not timely exhaust his administrative remedy for the May 24, 2017 claim.

Root also alleged he was retaliated against on July 14, 2017 based on the union grievance he filed.  The deadline for Root to file a complaint was, therefore, January 10, 2018.  Root did not file prior to that date.  Again, Root did not exhaust his administrative remedy for his July 14, 2017 retaliation claim.

Nevertheless, Root argues that although untimely, these instances of alleged retaliation may still be considered by the Court.  Root cites *Nat'l R.R. Passenger Co. v. Morgan*, 536 U.S. 101 (2002), in support of his position.  *Morgan* made clear, however, that for retaliation claims, as opposed to hostile work environment claims, each incident of retaliation must be timely exhausted.  *Morgan*, 536 U.S. at 122.  The Supreme Court explained that each retaliatory adverse employment decision "constitutes a separate actionable 'unlawful employment practice.'"  *Id.* at

---

[5] Root amended his HRB complaint on February 27, 2018.  (Doc. 33-15.)

114.  Therefore, the Court held a plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period. . . .  All prior discrete discriminatory acts are untimely filed and no longer actionable."  *Id.*  Accordingly, the Court concluded that "a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period – 180 or 300 days – set forth in 42 U.S.C. § 2000e–5(e)(1)."  *Id.* at 122.

In contrast, the Court found that "[h]ostile environment claims are different in kind from discrete acts."  *Id.* at 115.  The Court pointed out that by their nature such claims involve repeated conduct, and "a single act of harassment may not be actionable on its own."  *Id.*  Therefore, the Court held a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  *Id.* at 122.

But in this case, Root does not allege a claim for hostile work environment, only for retaliation.  (Doc. 1.)  As such, each of his discrete claims of retaliation were required to be timely exhausted.  Because the alleged claims of retaliation occurring before August 25, 2017 were not timely exhausted, the DOC is entitled to partial summary judgment on Count II as to those claims.

/ / /

/ / /

17

### b.   Claims Between February 27, 2018 and July 26, 2018

Root filed his second retaliation complaint with the HRB on January, 22, 2019.  (Doc. 37-1 at 2-4.)  Applying the 180-day filing period, any claim of retaliation prior to July 26, 2018 would not be timely exhausted by his second complaint.  The Court must, therefore, consider whether Root failed to exhaust his MHRA retaliation claims that occurred between February 27, 2018 (the date of his first HRB complaint) and July 26, 2018.

Where a plaintiff alleges acts of retaliation that post-date the filing of the administrative complaint, the court has subject matter jurisdiction over the post-filing claims that "fall within the scope of the [agency]'s actual investigation or an [agency] investigation that could reasonably be expected to grow out of the charge." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002) (holding allegations of discrimination which are not included in the plaintiff's administrative filing may be considered exhausted if the claims are "like or reasonably related to the allegations contained in the [agency] charge.").

To determine whether an unexhausted claim is "reasonably related to" an exhausted charge in the administrative complaint, courts may consider "such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge,

18

and any locations at which discrimination is alleged to have occurred." *Vasquez*,

349 F.3d at 644.  In making this determination, courts are to construe the

administrative complaint "with utmost liberality." *B.K.B.*, 276 F.3d at 1100.

Here, there are two alleged instances of retaliation that fall within the

disputed time period between Root's first and second HRB complaints.

Specifically, Root alleged he was retaliated against in May and June 2018 by not

being fully compensated for time spent participating in a civil court proceeding

pertaining to Law.  (Doc. 31-7 at 3.)  Root also alleged he was retaliated against in

May and June 2018 in connection with his request for instructions regarding

external PREA reporting.  (*Id.*)  The Court finds these claims are not reasonably

related to the allegations in Root's first HRB complaint.

Root's first HRB complaint alleged retaliation for failure to hire/promote

after he reported a PREA violation against Law.[6]  (Docs. 33-14; 33-15.)  Root

---

[6] Root's first HRB complaint also included claims that he was retaliated against by
Law in May 2017 and by Davenport in July 2017.  (Doc. 33-15.)  As discussed
above, these claims were not timely exhausted.  As a result, the Court will limit its
consideration of the "reasonably related to" test to only the exhausted claims.  *See
Finley v. Salazar*, 2013 WL 1209942, *10 (D. Mont. March 5, 2013) (noting that
the "'like or reasonably related to' exception to the exhaustion requirement may
allow a court to consider an unexhausted claim if it is reasonably related to an
exhausted claim, but it says nothing about allowing a plaintiff to proceed with an
unexhausted claim that is related to another unexhausted claim.").  Moreover, even
if the Court were to consider these claims, they are factually distinct from the
alleged retaliation for testifying and/or requesting third-party reporting instructions
in May and June of 2018, as they involve different operative facts, different
perpetrators, and occurred approximately a year apart.

asserted Schroeckenstein harbored ill feelings toward him because he had reported Law.  (Doc. 33-14.)  Root pointed out that Schroeckenstein was on the interview panel when he interviewed for a vacant Lieutenant position in January 2018.  (*Id.*)  Root was not selected for the position.  (*Id.*)  Root charged that Schroeckenstein personally participated in the decision not to hire him in retaliation for reporting Law.  (Doc. 33-15.)

With regard to the two unexhausted claims in his second HRB complaint, Root alleged that in May 2018, he was subpoenaed to testify in a civil action involving Law and his conduct at work.  (Doc. 31-7 at 3.)  Root was interviewed by the attorneys who issued the subpoena, and he appeared in court on May 16, 2018 to testify, but the matter was continued.  (*Id.*)  Root appeared in court again on June 6, 2018 and testified.  (*Id.*)  Thereafter, Root alleges he requested to be paid his usual compensation for the time he spent responding to the subpoena and testifying, but the DOC challenged his request as not work related and only paid him for the testimony he gave on June 6, 2018.  (*Id.*)

Next, Root alleged he learned of additional information regarding Law's propensity for sexual misconduct, but due to his negative experiences after filing the previous PREA report, sought guidance from human resources personnel in May 2018 about how to report the information outside of the DOC to a third party. (*Id.*)  Root states he was given misinformation by HR representative Jessica Sosa,

and was subsequently ordered to report any PREA information to the DOC

directly.  (*Id.*; Doc. 34-1 at ¶¶ 27-35.)  As a consequence, Root alleges his

supervisor, Lt. Johnston, became verbally abusive, and retaliated against him.  (*Id.*)

The Court finds these claims are not reasonably related to the allegations in

Root's first HRB complaint.  Root has essentially conceded that the claim of

retaliation related to his testimony is not reasonably related to the allegations in his

initial HRB complaint because he failed to address that claim in his response brief.

Further, although the unexhausted claims are similar to the charged claims in the

limited sense that they are related in some way to Law's alleged PREA violations,

the claims are otherwise factually distinct.  The exhausted claim in the first HRB

Complaint was focused on the failure to hire/promote and Schroeckenstein's

participation in that decision.  Whereas, the unexhausted claims in the second HRB

complaint allege retaliatory actions by different individuals (specifically, Sosa and

Johnston), who did not participate in any prior alleged retaliation.  In addition, the

alleged failure to compensate Root for his witness preparation time, and the events

relating to his request for third-party PREA reporting options, are completely

unrelated to the prior decision to hire/promote him.

Accordingly, the Court finds the unexhausted claims do not fall within the

scope of the HRB's "actual investigation" of the charge in the first HRB

complaint, or an investigation that "could reasonably be expected to grow out of

the charge." *Vasquez*, 349 F.3d at 644.  As such, the alleged claims of retaliation

occurring between February 27, 2018 and July 26, 2018 were not exhausted, and

the DOC is entitled to partial summary judgment on Count II as to those claims.

## IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants jointly move for summary judgment on Root's entire complaint,

but brief their arguments separately.  (*See* Docs. 46-48.)  The DOC argues it is

entitled to summary judgment on Root's Title VII claims (Count I) and MHRA

claims (Count II) because Root cannot establish the necessary elements for any of

his five claims of retaliation.  (Doc. 47.)  Schroeckenstein argues summary

judgment is appropriate on Root's First Amendment retaliation claim (Count III)

because Root engaged in public speech, and therefore, is not entitled to First

Amendment protection. (Doc. 48.)  Schroeckenstein further argues that even if

Root engaged in protected speech, he cannot establish his speech was the "but-for"

reason that he was not hired for the lieutenant position.  (*Id.*)

### A.    The DOC's Motion for Summary Judgment on Counts I and II.

Root has the initial burden to establish a prime facie case of unlawful

retaliation, which requires that he show (1) he engaged in a protected activity, (2)

he was subsequently subjected to an adverse employment action, and (3) there was

a causal link between his activity and the employment decision.  *Wrighten*, 726

F.2d at 1354.  If a prima facie case is shown, the burden then shifts to the

defendant employer to offer evidence of some legitimate, nonretaliatory reason for the adverse action.  *Id.*  If the employer makes such a showing, the plaintiff must then prove the employer's proffered explanation was a pretext for retaliation or that a discriminatory reason more likely motivated the employer's action.  *Id.*

As discussed above, the Court has already determined there are genuine issues of material fact regarding whether Root engaged in a protected activity.  The Court must next consider whether Root has made a prima facie showing that he was subjected to a materially adverse employment action, and if so, whether he has shown causation.

Root alleges the DOC engaged in a number of retaliatory acts including: (1) providing him with incorrect third-party reporting information; (2) only paying him for three hours of court testimony time; (3) assigning him a task that required him to work 15 minutes past the end of his shift; (4) failing to respond to his request for guidance about speaking with the media; and (5) failing to hire him for the lieutenant position in 2018.  The DOC argues that aside from the non-hire claim, none of the actions Root cites are materially adverse employment actions. Further, while the DOC concedes that Root can show an adverse employment action as to the non-hire claim, it asserts Root cannot establish the final requirement of causation.  The DOC also argues that it had legitimate, non-discriminatory reasons for all of the actions Root challenges.

23

Root counters that when viewed cumulatively, the alleged retaliatory actions are materially adverse because they would deter a reasonable employee from reporting misconduct.  Root further argues causation is satisfied with respect to these claims because the DOC's retaliatory intent may be inferred from the fact the alleged retaliatory actions occurred within a reasonable time following his PREA reporting.  Regard his non-hire claim, Root argues he can establish causation because there is evidence that the members of the hiring panel received information regarding his protected activities or referenced his activities in their candidate evaluations.  Root also contends there was no legitimate basis for the DOC's decision not to hire him.

### a.    Retaliation Claims based on Third-Party Reporting, Witness Pay, 15-Minute Hold Over and Media Inquiry

The Court finds that no reasonable trier of fact could find that the first four alleged acts of retaliation constitute materially adverse employment actions.  An employment action is materially adverse if "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  The significance of any alleged act of retaliation must be considered in the context of the particular circumstances.  *Id.*  But trivial conduct will not support a retaliation claim.  *Id.* at 69-70.  An employment action is not

24

materially adverse if it amounts only to "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 69. Rather, a plaintiff must show "retaliation that produces an injury or harm." *Id.*

First, Root's retaliation claim based on his receipt of incorrect third-party reporting information fails as a matter of law because he admitted that no retaliation occurred. When asked whether he thought Sosa was retaliating against him when she mistakenly told him the YMCA was the third-party reporting agency, Root testified "I don't believe that that was – that she was, no." (Doc. 49-2 at 14.) Further, the Court finds a mistaken reference to the YMCA versus the YWCA, would not dissuade a reasonable employee from reporting misconduct.

Second, Root argues he was retaliated against in connection with his pay for appearing as a witness in a legal proceeding involving Law. Root contends that initially he was told he would only be paid for one hour of testimony, rather than the two additional hours of time he spent waiting to testify and the time being interviewed by the attorney prior to the hearing. Root also complains that his request for reimbursement was subjected to heighted scrutiny. Ultimately, Root requested, and was compensated for three hours. (Doc. 31-6 at 3.) Citing *White*, Root argues the threat of withholding compensation, even if the wages are later paid, is a materially adverse action.

In *White*, the Supreme Court recognized that withholding wages could constitute a materially adverse action, even when the wages are later paid. *White*, 548 U.S. at 72. The facts of *White*, however, are plainly distinguishable from the present case. In *White*, the plaintiff was suspended without pay for 37 days before being reinstated and receiving back pay. *Id.* The Court noted that "[m]any reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* The Court therefore determined that a suspension without pay could deter a reasonable employee from filing a discrimination complaint, even if the employee eventually receives backpay. *Id.*

A complete withholding of all wages for over a month is substantially different from the allegations in this case. Here, Root has not even established that any pay was withheld. Root requested 3 hours of witness pay on his time card, and he was paid as requested. Root complains that he was not paid for the time he spent meeting with the attorney prior to his testimony. But Root did not request compensation for that time. Root's "mere speculation" that his request would have been denied is "insufficient to make a prima facie showing of adverse employment action." *Crown v. Wal-Mart Stores, Inc.*, 8 F. App'x 776, 779 (9th Cir. 2001). *See also Lucarelli v. Dillard*, 2006 WL 2038256, at *4, n.11 (N.D. Cal. July 19, 2006) (holding there was no adverse employment action where a correctional employee decided not to apply for a promotion because she thought an assistant warden

26

would block any such application, explaining "[b]ecause she never applied for a promotion, however, she can only speculate as to what Dillard might or might not have done, let alone the outcome thereof.").

Further, even assuming Root was initially told that he would only be paid for one hour of testimony, a mere threat is insufficient to constitute an adverse employment action. *See Hellman v. Weisberg*, 360 Fed. Appx. 776, 770 (9th Cir. 2009) ("[T]he mere threat of termination does not constitute an adverse employment action.'); *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (holding snide remarks and veiled threats did not constitute an adverse employment actions); *Baloch v. Kempthorne*, 550 F.3d 1191, (D.C. Cir. 2008) (proposed suspensions without pay that were not actually served were not adverse actions).

Finally, even if Root's request for reimbursement was subjected to heighted scrutiny, that is insufficient to show a materially adverse employment action. *See Phelps v. U.S. Gen. Servs. Agency*, 469 F. App'x 548, 550 (9th Cir. 2012) (excess scrutiny of employee's training request did not qualify as an adverse employment action). Moreover, Root suffered no adverse consequences of the alleged increased scrutiny, since he was paid for the time he requested. As such, Root did not suffer an adverse employment action in relation to his request for witness pay.

27

Third, Root contends he was retaliated against when he was required to work 15 minutes past the end of his shift on July 14, 2018.  Root asserts Johnston assigned him a task which he could not complete before the end of his shift, and spoke to him in a rude and aggressive manner.  In certain circumstances, work assignments can be considered retaliatory.  *White*, 548 U.S. at 71.  But minor annoyances that are typical in the workplace, such as "being required to perform routine undesirable tasks, and negative comments, are not adverse employment actions."  *Miller v. City & Cty. of Honolulu*, 2008 WL 11344987, *9 (D. Haw. October 30, 2008).

Here, Root was assigned a single routine task that required him to work 15 minutes past the end of his shift.  Root was paid overtime for the 15-minute hold over.  (Doc. 49-2 at 18.)  The Court does not find that a one-time, 15-minute holdover – where the employee was compensated with overtime – would cause a reasonable employee to be deterred from engaging in protected activity.  *See e.g. Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 486 (5th Cir. 2008)  (finding requiring the plaintiff to perform a single undesirable assignment would not dissuade a reasonable employee from reporting discrimination).  Moreover, even if Johnston was rude or verbally abusive when he assigned the task to Root, sporadic verbal altercations or lack of good manners do not qualify as adverse employment

actions.  *White*, 548 U.S. at 68.  As the Supreme Court has explained, Title VII "does not set forth 'a general civility code for the American workplace.'"  *Id.*

Fourth, Root argues the DOC retaliated against him by not timely responding to his request for guidance about speaking with the media.  On September 12, 2018, Root contacted Jason Ness at the MWP, and indicated he wanted to speak with a reporter.  (Doc. 59 at ¶ 109.)  Ness thanked Root for the information, but did not substantively respond to his request for guidance.  (*Id.* at ¶ 110.)  On September 13, 2018, Root emailed Judy Beck, the DOC Director of Communications and requested guidance about speaking to the media.  (*Id.* at ¶ 111.)  Beck responded the following day and referred Root to the DOC Media Relations Policy.  (*Id.* at ¶ 112.)  Root argues that the DOC's delay in responding to him was retaliatory because it dissuaded him from speaking to the media.

The Court does not find DOC's failure to immediately respond to Root's request was a materially adverse employment action.  Even assuming the delay discouraged Root from talking to the reporter, he has not shown how the DOC's conduct deterred him from accessing Title VII's remedial mechanisms.  In *White*, the Supreme Court explained that the antiretaliation provision seeks to prevent employers from deterring "victims of discrimination from complaining *to the EEOC, the courts, and their employers*."  *White*, 548 U.S. at 68 (emphasis added).  It is not concerned with complaints to the media.  Therefore, a short delay in

responding to an inquiry about speaking with a reporter, would not have discouraged a reasonable employee from reporting misconduct under Title VII.

In sum, when considered individually or collectively, the first four instances of alleged retaliatory acts do not rise to the level of materially adverse employment actions. Because Root has not carried his burden on the second prong of his prima facie case, the Court recommends that the DOC's Motion for Summary Judgment on Counts I and II be granted as to these claims of retaliation.

### b.    Non-Hire Retaliation Claim

Root claims that he was retaliated against for filing his 2017 grievance when he was not hired for the lieutenant position in January 2018. The DOC argues Root cannot show his 2017 grievance played any role in the decision not to hire him. The DOC asserts Root cannot establish causation because he has no evidence that members of the hiring panel knew of and discussed his prior protected acts. The DOC further argues it had legitimate non-retaliatory reasons for not hiring Root, namely that the other applicants for the position performed better during the interview process.

To make a prime facie showing of causation, the plaintiff must show that the retaliatory motive was the "but-for" reason for the unlawful employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for

causation."). The "but-for" causal link does not require that the protected activity be the sole cause of the adverse action; but it does "require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*; W*estendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (stating the plaintiff "had to show that her protected conduct was a but-for cause – but not necessarily the only cause – of her termination.").

The Court finds that Root has cited to evidence that raises genuine issues of material facts as to whether Root can establish prima facie causation.

Root was interviewed by a four-member panel, consisting of: (1) Associate Warden Schroeckenstein; (2) then-Lieutenant Michael Moorman; (3) MWP Warden Jennie Hansen; and (4) Lynette Belknap-Williams, a mental health therapist at MWP.  The DOC argues that of the four members on the hiring panel, only Schroeckenstein knew about Root's 2017 grievance, but alleges he did not discuss the grievance with the panel.  Root, however, has produced evidence from which a trier of fact could infer members of the hiring panel considered his prior protected acts.

For example, while Belknap-Williams testified she was unfamiliar with Root, she recommended against hiring him because he was "litigious."  (Doc. 59-9.)  At the time of Root's interview, however, he had not yet filed this action, and

was not involved in any other litigation.  Therefore, it could reasonably be inferred that the comment on his litigiousness was in reference to his protected activities. Likewise, while Hansen who testified she was not aware of Root's grievance at the time of his interview, noted "Set up grievance" on the Non-Scored Interview Form she completed.  (Doc. 59-7.)

Root further points out that although Moorman denied having knowledge of Root's protected activities at the time of the interview, he had been copied on an email from July 4, 2017, which Root sent to Human Resources Manager Cynthia Davenport.  (Doc. 59-15.)  The email indicates Root had declined to participate in a "mediation process" with the DOC, and references his PREA reporting and Law's alleged retaliatory behavior which were the subjects of his 2017 grievance.

In addition, Root points to evidence that Schroeckenstein may have harbored animus toward him.  For example, Moorman testified Schroeckenstein was "frustrated" with Root over the PREA report concerning Law because he perceived Root was trying to set up Law. (Doc. 59-11 at 5.)

The Court, therefore, finds there are genuine issues of fact as to whether Root can demonstrate but-for causation between his protected activities, and the DOC's decision not to hire him for the lieutenant position in January 2018.

The DOC next argues that it had a legitimate non-retaliatory reason for not selecting Root for the position.  The DOC asserts the panel made its decision based

on the objective performance of the candidates' interviews, and the successful
candidate, William H. Johnston, outperformed Root during the interview.  In
response, Root points out that the DOC's stated reasons for selecting Johnston over
him have shifted over time.

An employer's conflicting explanations for its challenged employment
action can be evidence of pretext.  *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d
564, 569 (9th Cir. 2004) ("From the fact that Raytheon has provided conflicting
explanations of its conduct, a jury could reasonably conclude that its most recent
explanation was pretextual.")  Here, in response to Root's first HRB complaint, the
DOC initially asserted that Johnston was selected because he "had seniority and
was perceived to have demonstrated strong leadership."  (Doc. 59-6 at 4.)  The
DOC also stated Root was not selected because he interviewed poorly, and had a
poor writing sample.  (*Id.* at 5.)  Now, the DOC asserts interview performance was
the decisive factor for the position, and Root did not have the best interview.

Root points to evidence that undercuts two of the reasons initially cited by
the DOC for not hiring him.  For example, Johnston had a history of disciplinary
issues and had been placed on administrative leave after he was charged with
partner/family member assault.  (Doc. 59-3 at 5.)  He was described as
"domineering" and "disrespectful" (Doc. 59-2 at 10), "generally sarcastic and
snarky" (Doc. 59-3 at 19), and Schroeckenstein admitted to thinking Johnston had

been a "jackass or an ass" towards Root.  (*Id.* at 18-19.)  Not long after his

promotion, Johnston was terminated due to his conduct as a lieutenant.  (*Id.* at 5;

Doc, 33-9.)

In contrast, Root points out that he has never been disciplined or placed on

administrative leave, and shortly after the interview, Root was named MWP

Employee of the Quarter.  (Docs. 33-12; 59-1 at 56.)  "Facts tending to show that

the chosen applicant may not have been the best person for the job are probative as

they 'suggest that [the explanation] may not have been the real reason for choosing

[the chosen applicant] over the [plaintiff].'"  *Godwin v. Hunt Wesson, Inc.*, 150

F.3d 1217, 1222 (9th Cir. 1998), as amended (Aug. 11, 1998).

In addition, the panel gave Root and Johnston's writing samples the same

score, and Schroeckenstein admitted there was no qualitative differences between

the two documents, except for a misspelled word.  (Doc. 59-4 at 9, 18.)  Therefore,

this objective measure of performance was essentially equal, indicating it may not

have been the real reason Johnston was chosen over Root.

The DOC's abandonment of these earlier cited reasons for not selecting Root

could suggest none of its proffered reasons was the true reason he was not hired.

"Although 'shifting explanations are acceptable when viewed in the context of

other surrounding events ... such weighing of the evidence is for a jury, not a

judge.'"  *Godwin*, 150 F.3d at 1222 citing *Payne v. Norwest Corp.,* 113 F.3d 1079,

1080 (9th Cir.1997).

Further, the Ninth Circuit has cautioned that the use of highly subjective criteria, such as interview performance alone, should be subject to close scrutiny. *Jauregui v. City of Glendale*, 852 F.2d 1128, 1136 (9th Cir. 1988) (cautioning "that subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized"); *Bergene v. Salt River Project Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) ("Against the background of the other evidence of pretext, the subjective nature of [the] criteria provides further circumstantial evidence that [defendant] denied [plaintiff] the promotion as a form of retaliation[.]").

Based on the evidence taken as a whole, the Court finds there are genuine issues of fact with respect to pretext. Accordingly, the Court cannot find as a matter of law that the DOC did not retaliate against Root when it did not select him for the lieutenant position.

The Court, therefore, recommends that the DOC's motion for summary judgment on Counts I and II be denied with respect to Root's non-hire retaliation claim.

## B.    Schroeckenstein's Motion for Summary Judgment on Count III

Root alleges in Count III of his complaint that he was subject to retaliation for engaging in activities protected by the First Amendment. "The First

35

Amendment shields public employees from employment retaliation for their protected speech activities." *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th Cir. 2013). Schroeckenstein moves for summary judgment on the claim, arguing that Root's First Amendment retaliation claim fails as a matter of law because Root did not engage in protected speech.

First Amendment retaliation claims are analyzed under a sequential five-step series of questions:

> (1) whether the plaintiff spoke on a matter of public concern;
> (2) whether the plaintiff spoke as a private citizen or public employee;
> (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;
> (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and
> (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Schroeckenstein does not contest that Root spoke on a matter of public concern. But Schroeckenstein asserts Root's claim fails under the second element, because Root spoke as a public employee, and not a private citizen.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, (2006). Conversely, "statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the

36

questioned statements, or if the speech was not the product of 'perform[ing] the tasks [the employee] was paid to perform.'"  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (internal citations omitted). Whether a plaintiff's speech was made in the course of his official duties "presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Id.* at 1130.

Generally, if a public employee works in a hierarchical employment setting, such as law enforcement, and raises complaints or concerns about his job duties up the chain of command, "that speech is undertaken in the course of performing his job" and is not protected.  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008).  On the other hand, if he "takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.* This is because "government employees are commonly required to report misconduct to their supervisors, [whereas] reports of misconduct to authorities outside the department are not often considered work duties that the employee is 'paid to perform.'"  *Ho-Chuan Chen v. Dougherty*, 625 F.Supp.2d 1091, 1097 (W. D. Wash. 2008).  The focus of the inquiry, however, is not on whether the speech was internal or external.  "The critical inquiry is instead whether [the plaintiff]

37

engaged in the relevant speech 'pursuant to [his] official duties." *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006).  The court must therefore, "evaluate whether speech – be it internal or external to a government employee's department – was part of the work that the employee was 'paid to perform.'" *Ho-Chuan Chen*, 625 F.Supp.2d at 1097.

For example, in *Frietag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), the Ninth Circuit held that a correctional officer's "internal reports of inmate sexual misconduct and documentation of the prison's failure to respond" were not constitutionally protected speech. *Id.* at 546.  But the court held the officer "acted as a citizen," and her communications were therefore protected under the First Amendment when she complained about the same circumstances to a state senator and to the state Inspector General. *Id.* at 545-46.  The court explained that it was not part of the officer's "official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly[.]" *Id.* at 545.

The same is true here.  Roots PREA report to his chain of command may not be protected speech.  But reports made outside Root's official duties may be protected.  For example, it does not appear that Root's union grievance (as opposed to his PREA reporting) was required by his job duties.  As such, Root's 2017 grievance is constitutionally protected speech. *See e.g. Ho-Chuan Chen*, 625 F.Supp.2d at 1098 (holding the plaintiffs' union grievance was protected speech

because "nothing in the record suggests that filing grievances was an official duty that Plaintiffs were 'paid to perform.'"); *Dahlia*, 735 F.3d at 1077 (holding the plaintiff's report to his police union constituted protected speech because it was reasonable to infer he did not have a work duty to report threats to his union).

But even if Root is considered to have been performing work duties when he brought the 2017 grievance, he also reported the same information regarding his claims of retaliation outside of his chain of command, to OHR Director Kila Shepherd, HR Manager Cynthia Davenport, and externally to PREA Resource Center Senior Advisor David Gaspar, and representatives from the Montana Human Rights Bureau and the Governor's office.  (Docs. 59-12 at ¶ 16; 59-14, 59-15.)  "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties."  *Dahlia*, 735 F.3d at 1074.  Here, Schroeckenstein has not pointed to any evidence in the record that Root's job duties required him to report his grievance outside of his chain of command or to these outside authorities.  As such, even if Root's internal grievance is not protected speech, his external communications are.  *Freitag*, 468 F.3d at 546; *Dahlia*, 735 F.3d at 1074.

The Court, therefore, finds Root's 2017 grievance, and his other reports made outside his chain of command, may form the basis of his First Amendment retaliation claim.

39

Schroeckenstein next argues that Root cannot establish that his 2017 grievance was the but-for cause of the decision not to promote him. As discussed above, the Court has determined there are genuine issues of fact as to whether Root can demonstrate causation and pretext.

Accordingly, the Court recommends that Schroeckenstein's motion for summary judgment on Count III be denied.

## V.    CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.    The DOC's Motion for Partial Summary Judgment (Doc. 29) be **GRANTED in part and DENIED in part**;

2.    Defendants' Motion for Summary Judgment (Doc. 46) be **GRANTED in part and DENIED in part**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 19th day of January, 2021.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

41